This officer could have emailed the day before and said, this is the results, we've lost the printout, generate a report. Things are just missing from this. Well, you could argue that for any business record, couldn't you? Well, then you have to have someone that's familiar with the actual business of generating the report. You don't have to do that. And has to explain that it's made at or near the time of event. Well, that's not the business record exception. That's not, that way, you don't need somebody who's familiar, you need to know, somebody's got to testify that it's regularly kept, there are certain factors that have to be testified to. But you don't need the person who actually created the document. Well, the officer is the one that says, yes, it's made in the regular course of business, but he would have no way of knowing that. He doesn't explain how he knows that. He's a police officer doing a breath test. He's not the person generating these reports in Springfield. But that's not what the business record exception provides. You don't need somebody who generated it in Springfield. Well, we need to know, we have to have someone that says that this report is made in the regular course of business at or near the time of the event. This report we know was actually generated the day before trial. It was not made at or near the time of the event based on the date on the report. And we don't know that it's the regular course of business to make these records. Clearly, this one has just been sent out for purposes of trial in lieu of the breath test ticket that they've lost. So there's just a complete absence of information about this document. I suppose if they had shown how this was generated and then, you know, if it was, you know, the steps of however it was created, then possibly it would have been admissible. But otherwise, the police officer's testimony that her BAC was .170 and the logbook are both hearsay documents. The only reason that this hearsay information is even allowable is because it's generated out of a machine and presumed reliable and accurate based on the other orth factors. So our position is that they did not do the foundation for presenting the breath test ticket results in this case and we're asking your honors to reverse her conviction. For the second part, as I outlined in the brief, just to make a couple points about Section A2. My main point being that there was no proof of actual impaired driving. I'd like to point out that the state continually talks about how the evidence showed that Letitia Eagletail crashed into this other car. No one testified that she crashed into another car. When the officers arrive on the scene, the cars are not even touching. We don't know what happened. Due to the lack of information, the judge had to acquit her of failure to reduce speed to avoid an accident because nobody testifies to what happened. So we have a case with no actual impaired driving, well, evidence of it, and we have an HGN test. Didn't she say that she was driving? It's not a question of her driving. It's a question of most cases, so something like someone's driving erratically or they're crashing or weaving around the road. She said she had two or three errors and she had punched that she thinks was spiked. Yes. She admitted to all that. Yes. Also, in McCown, the Illinois Supreme Court, in the second McCown decision, said that HGN test results are admissible when they are administered according to the NHTSA protocol by a properly trained officer. In this case, just want to point out that the officer said that he held the pen six to eight inches from her face and the NHTSA manual requires it to be 12 to 15. So this officer, although opposing counsel describes him as an expert in DUI, did not even administer the HGN test correctly. So due to the questions remaining about the Section A2 conviction, coupled with the fact that we don't have an admissible breath test result, if Your Honors do not reverse both subsections of her convictions, we're asking for a new trial on the second driving under the influence conviction. Thank you very much, Your Honors. Do you have any other questions? Thank you. May it please the Court. Again, I'm Assistant State's Attorney Morgan Muslin on behalf of the people of the State of Illinois. The trial court here properly exercised its discretion when it admitted defendant's breathalyzer test results. On July 21, 2010, the officers arrived at the scene of an accident on a public way. Defendant was alone in the car in the driver's seat. Defendant admitted to driving and to drinking. The officers smelled alcohol. Defendant's eyes were bloodshot. Her speech was slurred. And defendant took and failed three field sobriety tests. Defendant also consented to a breathalyzer test, which resulted in a BAC level of .170, which was over twice the legal limit in Illinois. And defendant was given an original copy of those results. The trial court properly exercised its discretion here. Defendant contends that short of admitting the actual breath ticket into evidence, any defendant should escape criminal liability for her conduct. However, this is an extremely narrow and erroneous interpretation of the term printout that's referred to by the Orth Court. As long as the breathalyzer test results can be identified as the results given to defendant, as required by the Fifth Factor of Orth, those results should be admissible, regardless of whether the initial actual breath ticket or a duplicate printout containing the same results is presented to the court. Defendant concedes that the first four factors of Orth were met, which is that it was administered in accordance with the uniform standards adopted by the Illinois State Police, that the officer was a certified breath doc, that the model of the breathalyzer machine was approved by the Department of Illinois State Police, the machine was regularly tested for accuracy and functioned properly, and also concedes that defendant was observed for 20 minutes prior to taking the test and did not eat, drink, or regurgitate during that time period. Defendant only argues that the printout displaying the results of her test shouldn't have been admitted because it's not the actual breath ticket. And nowhere in Orth does it require an actual breath ticket. It says printout, and that's exactly what was admitted into evidence. But it wasn't the printout that was lost, obviously. Well, what happens when you take the breath test is a little receipt is printed from the actual machine with the results. And that printout and receipt was given to defendant, and the police had a copy. And the police lost their copy. The record's unclear what occurred, but it was misplaced as it was not presented. And the case was continued from time to time in order to try to find it? The record indicates that the continuances were attributed to both parties. It was not solely the state-pushing trial. But, yes, there were continuances in search of the breath results. So if there were continuances in search of the breath results, why isn't it necessary to have the original? Because you could have gone to trial earlier if you were searching for it. Why search for it? The record does not indicate what occurred or why this intoxinant misreport wasn't brought to trial sooner. But it does indicate that the continuances were attributed by both parties. Defendant asked for six-month continuance at one point. So the year-long extension was, in fact, attributed to two parties. And as far as the foundational requirements, the officer testified that who has personal knowledge, he's certified. He's certified by the Illinois State Police Academy. He took refresher courses. He's certified to use that specific machine. He testified to exactly what he did. And he testified that the results of that test stay inside of that machine and then are sent over to a large computer in Springfield. And he knew. He testified that what he was taught in those classes is that to get a copy of those results, he could contact the State Academy that maintains them in that computer and they could reprint them. And that is what occurred here. The intox misreport had the ECI number, the serial number of the machine. It had the location the test was given, the test number, the date of the test, which was July 22, 2010. The operator's name and ID number, the arresting officer's name and ID number, the time and results of the accuracy check, and also the time and results of defendant's blow. Ms. Reck argued that there's been no cases in which a non-original breath ticket was used, at least apparently. Does that not speak something about the necessity for an original? No. Nowhere does it indicate original. And in the fifth factor of orth, it also does not say that a copy is not sufficient as a printout. Here, this is exactly what we have. It's a printout of the results. Those same results were subsequently printed. The officer testified that these results were not different. They accurately and truly depicted those. Excuse me. We don't know if they're the same results because there's a missing link. Think for a minute. If this were, say, a consumer fraud case and somebody bought a $1,000 refrigerator from some company and they lost their receipt and the refrigerator didn't work and they said, oh, I have a printout from the main office's computer, wouldn't you be saying, well, how can you verify that that's the right printout for this refrigerator? Wouldn't you be asking for more foundation for the company computer printout instead of the store receipt? Yes, Your Honor, but we do have that here. What do you have? We have that through not only the testimony of the officer, who had personal knowledge and was the one who gave the test. The officer does not have personal knowledge about what the state police do. He has knowledge about what he was told the state police do. He's never been to the state police, as I can read from the record. He's never seen their computer. He's never talked to their computer programmers. He's never witnessed any of that. He's never produced any of those records. He's never done anything at the state police level. Somewhere in some training they said, oh, well, don't worry about it. It's stored on the state police computer. And there's no one from the state police saying, yep, we've got it. What I meant by he had personal knowledge, Your Honor, is that he has personal knowledge that the results that appeared on that printout were, in fact, the results of the test that he gave to the defendant and that he personally input all that information. It's just like a nurse who's in a hospital who draws blood and gives it to the blood bank and then the information winds up being generated by a computer and then finds its way back into the patient's chart. Is that fair? Yes. However, that would take more time than the process as it's instantaneous with a blow. You just mentioned a few minutes ago, if you could go over them again, what is the information that is in the document that ultimately was admitted at trial that is consistent with the other testimony at trial in terms of what I would call verifying factors to verify that this document relates to the breath sample that was taken from this defendant? It is the ECI serial number, which was 4216, the location the test was given, which is the 8th District, the test number, the entered date and time, which was July 22, 2010, the operator's name and ID number, the arresting officer's name and ID number, the time and results of the accuracy test, defendant's name, sex, license number, and date of birth, and the time and results of defendant's blow. All right. Was there anything inconsistent in any of that information as compared to the other information available at trial? No. Everything was accurate and matched. And, in fact, the log book, which was also admitted into evidence, which the officer, the breath tech who testified, input all the information that day, immediately after the test, and that information also had the ECI serial number, the location the test was given, the defendant who was tested, the date, July 22, 2010, the time, 1252 a.m., the results, .170, the operator's name and ID, and the arresting officer's name and ID. And this information that was entered into evidence and testified to did, in fact, match and was the nexus that indicates, as the fifth factor of orth requires, that the evidence appearing on the printout sheet can be identified as the test given to the motorist, which did, in fact, happen here through the testimony and also through the log book that was entered into evidence. With regards to the second argument made by defense counsel that the defendant was not seen driving, 11501A2 requires that a defendant drove or was in actual physical control of any vehicle in Illinois. Defendant was in the driver's seat of the vehicle. with the keys in the ignition and admitted to the officers that she was, in fact, driving. Therefore, defendant does not need to be seen driving in order for her to be found guilty of a conviction under 11501A2. So for the reasons mentioned in our brief and the reasons stated now, we ask that you affirm the trial court's finding of guilt. Thank you. Thank you. I don't have too much to say in rebuttal except to point out that I'm not contesting that she wasn't driving the car. My point is that there was no evidence of erratic driving, which is an important point in most DUI cases. There's been some evidence of erratic driving. And we just have a lack of testimony and evidence in this case of that was what was going on. Next, as far as the logbook, to emphasize again, the logbook and the officer's testimony are not sufficient on their own to admit breath test results. There has to be a printout. So it doesn't really matter that the logbook says such and such or the officer said he saw the results. If the information is identical, why not? Because the logbook has a strictly, it's also a hearsay document. It's a hearsay document. It's a business record. It's a business record if it's admitted as a business record. In this case, it's not used to prove the truth of the breath test results. It's only real purpose as administrative to show that the machine is tested for its reliability and working accurately. It's an administrative regulation. It's not a requirement for admitting the results. The result that ORTH requires, the printout. It's just like. Are you insinuating, though? Let me just be clear about this. I don't really think you are, but there's some subtext here. Are you insinuating that somebody took the other information and then went to the computer and created this document in order just to win this case? It's a potential possible. I'm not, like, actually stating they did that. But if they did it, their work was perfect because every single serial number, every piece of information, every date, every place, every I was dotted and every T was crossed. So they did good work. Correct, Your Honor. So it's not a matter of. The main point is here we have rules of evidence and the admissibility of documents, and there's a reason why we require this. Otherwise, as Your Honor, Justice Piscinski suggested, there could be the potential for fraud. So we can't just make exceptions for things. How could we require a system where if a scrap of paper gets lost in all of the record keeping in the county of Cook that you can't go to a computer and retrieve the same information? If you wanted to have that kind of foundation requirement in this kind of case, then the business record exception would be of very little use, it seems to me. I think that possibly there could be. Possibly the fifth orth requirement, if we had the proper foundation for this as a business record, I submit that we did not have anybody that makes this record in Springfield talk about how it was made, that it was made in the regular course of business, that it's the regular course of the business to make this, and it wasn't just generated the day before trial for purposes of trial.  If it's not something that's made in the regular course of business, it's not a business record, under the business record exception. I don't understand how you can argue it wasn't made in the regular course of business when that's exactly what happens every time they do these type of tests. They sent that information to Springfield. But we're missing that step where someone says these reports, such as was introduced at trial, this IntoxNet MIS report, I don't even know what MIS means. I don't know why this report was generated, how often it's generated, if it's ever generated. You know it was generated in order for the information that was contained in it, because that's what they wanted the court to see. Well, it's not, no one, there's the missing steps that this was made in the course of business. It's the regular course of the business of the Illinois State Police Agency to make these reports. We don't know anything about the computer where it was stored. Who did it? Who requested this? Was it the state? Was it the police officer? Why is that relevant? It should be relevant to know what's going on here. We don't have, we're just missing. Where in the rule, the exception to the hearsay rule, does it say that's relevant? You say it should be relevant, but is it relevant? I'm saying the foundation for this document to show that this is the printout, we are lacking information. Even though it's identical to the information that we know? That we know from the officer's testimony and what he wrote in the logbook. Right. Thank you very much, Your Honors. Okay, thank you. Thank you. Thank you all for excellent briefs and excellent arguments. We will take this case under advisement. We'll adjourn for a few minutes and come back for the next case.